**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Laurie Range, *et al.*,

      Plaintiffs,

           v.                         Case No. 1:10cv473

Kenneth Douglas, *et al.*,                 Judge Michael R. Barrett

      Defendants.

## OPINION & ORDER

This matter is before the Court upon Defendants' Motion to Dismiss and Motion for Summary Judgment. (Doc. 82.) Plaintiffs filed a Response in Opposition (Doc. 83) and Defendants filed a Reply (Doc. 90). Defendants also filed a Notice of Supplemental Authority in support of their Motions. (Doc. 96.) Also before the Court is Plaintiffs' Motion to Add Lakshmi Sammarco, M.D. as a Party. (Doc. 94.) Defendants filed a Response in Opposition (Doc. 97) and Plaintiffs filed a Reply (Doc. 99).

## I.   BACKGROUND

Plaintiffs are the family members of Karen Sue Range, Charlene Appling and Angel Hicks.[1] It is undisputed that Defendant Kenneth Douglas had sex with the dead bodies of these women while they were housed at the Hamilton County Morgue. Douglas was employed by the Hamilton County Coroner's Office as a Morgue Attendant from 1976 until 1992. During that time period, Morgue Attendants were responsible for receiving dead bodies and inventorying personal items. Morgue Attendants also assisted in autopsies and

---

[1]Plaintiffs dismissed the claims of Sherril L. Chatham and Scott L. Range, who are two of the siblings of Karen Sue Range. (Doc. 81.) However, the claims of Laurie Range, the mother of Karen Sue, and her other siblings still remain pending.

releasing bodies to funeral homes.  (Doc. 49, Tyrone Smith Depo. at 49-51.)  Prior to being hired, Morgue Attendants were subject to background checks and a drug test.  (Id. at 18-21; Doc. 48, Clyde Gamble Depo. at 80-81.)[2]

As a Morgue Attendant, Douglas was supervised by Bernard Kersker, who was the Morgue Director.  Kersker reported to Carol Maratea, the Morgue Administrator, who in turn reported to Dr. Frank Cleveland, who was the Coroner.  (Doc. 46, Bernard Kersker Depo. at 41.)  Throughout his fifteen-year tenure at the Morgue, Douglas had problems with tardiness and attendance.  In a 1980 performance evaluation, Kersker rated Douglas low for dependability, and noted that "Kenneth has had problems over the past year which affected his dependability and interest in the job."  (Doc. 85-23.)  In a 1984 evaluation, Kersker noted that "Ken has had a chronic tardy problem over the years.  . . . I also cautioned Ken about a possible misuse of sick time."  (Doc. 85-25.)  In a 1990 evaluation, Kersker cautioned Douglas that he had used twenty-five sick days.  (Doc. 85-30; Kersker Depo. at 103-104.)  In 1992, Kersker noted that Douglas had used twenty-three sick days. (Id. at 105.)

Douglas was disciplined for his tardiness by being made to stay late or having his pay docked.  (Kersker Depo. at 93-94.)  Kersker discussed Douglas' attendance and tardiness problems with Dr. Cleveland.  (Id. at 110.)  Douglas also talked with Dr. Cleveland about the problems.  (Doc. 47, Kenneth Douglas Depo. at 60-61.)  Dr. Cleveland told Douglas to "get it right or be fired."  (Id. at 60-63.)

Douglas explains that he was late or missed work because of problems with alcohol.

---

[2]Douglas testified that when he was hired, he was subject to a background check, but not a drug test.  (Douglas Depo. at 24-25.)

(Id. at 59.)  Douglas claims he told Kersker that his drinking caused him to be late and miss work.  (Id. at 58-59.)  Douglas explained that he had two DUI convictions, and as a result of the second conviction, he served a ten-day jail sentence.  (Id. at 43-44.)  Douglas claims he told Kersker about the DUI conviction because he needed to use four days of vacation time to cover the time he was in jail.  (Id. at 43-44.)  Douglas also claims he told Kersker that he participated in the Alcoholics Anonymous program.  (Id. at 54.)

Douglas testified he started using crack and powder cocaine in the mid-'80s.  (Id. at 39, 65.)  Also around this time, Douglas overdosed on pills and was hospitalized for three days.  (Id. at 52.)  During his hospitalization, Douglas received mental health treatment.  (Id.)  Douglas testified he told Kersker about the incident, and believes the hospital called the Coroner's Office.  (Id. at 53-54.)

Douglas testified that he drank at work when he was alone on second shift and on weekends.  (Id. at 112-13, 116.)  Douglas also testified he would drink and smoke marijuana before coming into work.  (Id. at 39.)  Douglas explained he was under the influence of alcohol when he had sex with the dead body of Karen Sue Range, and under the influence of alcohol and cocaine when he has sex with the dead body of Charlene Appling and Angel Hicks.  (Id. at 94.)  Douglas claims the alcohol and drugs caused him to have sex with the dead bodies: "[I]f I had not been under the influence none of this would have ever happened.  When I was sober, no, none of this happened."  (Id. at 117.)

Kersker does not recall being told by Douglas that he had an alcohol problem. (Kersker Depo. at 105.)  Kersker testified he never saw Douglas consume alcohol, or smelled alcohol on him.  (Id. at 69-72.)  Kersker also testified he did not know that Douglas had a drug problem.  (Id. at 149.)  Kersker testified he assumed Douglas' problems were

3

marital.  (Id. at 91-92.)  Kersker knew Douglas had a reputation as a "ladies man" and often took calls from women trying to reach Douglas at the Morgue.  (Id. at 72.)  Kersker testified he told Douglas to "tell these girls not to keep calling here.  You talk to them after work." (Id. at 72-73.)

In 1987, Douglas' wife, Pat Chavis called Kersker and explained that Douglas was coming home drunk from work.  (Doc. 51, Pat Chavis Depo. at 20-21.)  Kersker told Chavis that he "would look into it."  (Id. at 21.)  After about six months, Chavis called Kersker a second time because Douglas was still coming home drunk.  (Id. at 23.)  Chavis told Kersker that Douglas was still drinking at work and that Douglas "smelled like sex" when he came home.  (Id. at 23, 26-27.)  Chavis testified that Kersker responded by telling her that "whatever happens on county time, on county property, is county business and you are an insecure, jealous wife and I don't want you to call here anymore."  (Id. at 27.)

In 1989, Chavis told Maratea her concerns about Douglas.  (Id. at 33.)  Chavis told Maratea that Douglas was having relationships and coming home "smelling like sex."  (Id. at 32.)  Chavis told Maratea that she suspected it was Maratea's secretary or "it may be somebody he's bringing in at night."  (Id.)  Maratea told Chavis that she "would look into it."  (Id.)

In 1992, Douglas resigned from his employment with the Coroner's Office.  (Douglas Depo. at 65.)  Douglas claims his drug problem was one of the reasons he resigned.  (Id.)

Years later, it was discovered that Douglas had had sex with the dead bodies of Karen Sue Range, Charlene Appling, and Angel Hicks.  Douglas was convicted of Gross Abuse of a Corpse on September 8, 2008.

Plaintiffs have brought claims for (1) violation of civil rights under 42 U.S.C. § 1983;

4

(2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; and (4) negligent retention and supervision.

Defendants argue that Plaintiffs' federal claims should be dismissed because there was no constitutional violation and this Court should not retain jurisdiction over Plaintiffs' remaining state law claims.

## II.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Matsushita*, 475 U.S. at 587. However, the nonmoving party may not rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

### B.  Named parties

There is some dispute between the parties as to whether Plaintiffs have named the proper parties. The individually-named Defendants are Douglas, Kersker, and Dr. Cleveland. Both Kersker and Dr. Cleveland have passed away during the pendency of the

5

suit.[3]  Plaintiffs have also named as a defendant the "Hamilton County/Board of Hamilton County Commissioners."

### 1.    Kenneth Douglas

In their motion, Defendants explain that the Hamilton County Coroner's Office is not providing a defense to Douglas because his criminal acts were acts outside the scope of his employment.  (Doc. 90.)

While Plaintiffs' Complaint was served on Douglas, no response has been filed by him.  Plaintiffs have not sought an entry of default.  This Opinion and Order will not address the claims pending against Douglas.

### 2.    "Hamilton County/Board of Hamilton County Commissioners"

Defendants argue that the Hamilton County Board of Commissioners is not a proper party and should be dismissed.  Defendants explain that the Commissioners are not responsible for the operation of the Coroner's Office.  However, Plaintiffs respond that the Commissioners are only being sued in their official capacity.

A suit against an individual in his or her official capacity is the equivalent of a suit against the governmental entity.  *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing Will v. Michigan Dept. of State Police, 491 U.S. 58, 68 (1989)).  Therefore, Plaintiffs' Section 1983 claim against the Commissioners in their official capacity should be treated as a claim against the County.  *Accord Hainey v. Parrott*, 2005 WL 2397704, *10 (S.D. Ohio Sept. 28, 2005) ("the County Commissioners as representatives of Hamilton County may be held liable in their official capacities for the actions of the coroner.").  While naming

---

[3]The estates of Kersker and Dr. Cleveland have been substituted.  (See Doc. 38 & minute entry 6/22/12.)

the Commissioners in addition to, or as an alternative to the County, is somewhat redundant, the Court finds no reason to dismiss Plaintiffs' Section 1983 claims against the Commissioners in their official capacity.

### 3. Bernard Kersker and Dr. Frank Cleveland

Plaintiffs have sued Defendants Kersker and Dr. Cleveland both individually and in their official capacity. Defendants argue that by only naming Dr. Cleveland, Plaintiffs have failed to properly sue the Hamilton County Coroner's Office. Defendants claim that the "Coroner's Office" and the current Coroner should be sued. Defendants have not cited any case law in support of this argument.

Plaintiffs counter that the Coroner's Office is not an entity capable of being sued or satisfying judgments. While it appears that there is no case law directly on point, the Court finds that there is no distinction between a county's coroner's office and a county's sheriff's office. The Sixth Circuit has affirmed the dismissal of a county sheriff's office "because under Ohio law, a county sheriff's office is not a legal entity capable of being sued for purposes of § 1983." *Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 347 (6th Cir. 2007). Therefore, Plaintiffs' failure to name the Hamilton County Coroner's Office is not cause for dismissal.

The Court also concludes that the current Coroner is not a proper party in this case. As explained above, any suit against an individual in his or her official capacity is the equivalent of a suit against the governmental entity. Therefore, bringing official capacity claims against the current Hamilton County Coroner would be redundant since the County and the County Commissioners are already named as parties. As to individual capacity claims, there are no allegations in the Complaint directed toward the current Coroner. In

7

fact, the Complaint specifically disavows making any such allegations: "This case is based on abuses that occurred during the tenure of former Coroner and Defendant Dr. Frank Cleveland and does not allege any misconduct by the current Coroner." (Doc. 1, ¶ 3.) Therefore, the Court concludes that Plaintiffs' failure to name the "Coroner's Office" or the current Hamilton County Coroner is not grounds for dismissal. For the same reasons, the Court denies Plaintiffs' Motion to Add Lakshmi Sammarco, M.D. as a Party.

The Court will now turn to Plaintiffs' federal claims under Section 1983 and state law claims under Ohio law.

### C.    Section 1983

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Tuttle v. Oklahoma City*, 471 U.S. 808, 816 (1985). Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights. *Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 351 (6th Cir. 2001) (citing Bloch v. Ribar, 156 F.3d 673, 677 (6th Cir. 1998); and United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 33 (6th Cir. 1992)).[4]

---

[4]42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

There is no dispute that Plaintiffs have established state action. Instead, Defendants argue that Plaintiffs have not established a constitutional deprivation. Plaintiffs claim that Defendants violated their right to substantive and procedural due process.

### 1. Qualified Immunity

Defendants Kersker and Dr. Cleveland argue that they are entitled to qualified immunity from Plaintiffs' Section 1983 claims brought against them in their individual capacity.

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing Procunier v. Navarette, 434 U.S. 555, 565 (1978)). Qualified immunity involves a two-step inquiry: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?;" and (2) "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (explaining that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). While the defendant bears the burden of pleading the defense of qualified immunity, the ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Miller v. Administrative Office of Courts*, 448 F.3d 887, 894 (6th Cir. 2006) (citing Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006)).

The Court will first determine whether Plaintiffs have shown that Kersker and Dr. Cleveland violated a constitutional right. Plaintiffs bring claims under the Due Process Clause of the Fourteenth Amendment, which provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

## 2.    Substantive Due Process

Substantive due process protects against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). The Sixth Circuit has explained that substantive due process claims can be divided into "(1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Pusey v. City of Youngstown*, 11 F.3d 652, 656 (6th Cir. 1993) (quoting Mansfield Apartment Owners Ass'n v. City of Mansfield, 988 F.2d 1469, 1474 (6th Cir. 1993)), *cert. denied*, 512 U.S. 1237 (1994).

In this case, Plaintiffs appear to have two theories. The first theory is that Defendants had a duty to protect the bodies of their family members while they were housed in the morgue. The second theory is that allowing Douglas to have sex with the dead bodies of their family members shocks the conscience.

To establish their first theory, Plaintiffs cite *Chesher v. Neyer*, 477 F.3d 784 (6th Cir. 2007). In *Chesher*, the defendants permitted a photographer to take photographs of dead bodies in the Hamilton County Morgue without the knowledge or consent of family members.[5] *Id.* at 787. These photographs depicted "the bodies in unnatural 'artistic'

---

[5]The events in *Chesher* occurred between August of 2000 and mid-January of 2001. 477 F.3d at 787. Dr. Cleveland was no longer the Hamilton County Coroner at that time, and

10

poses, often employing props for effect."  *Id.*   There was evidence in the record that the Coroner knew in advance the nature of the photographs to be taken; and members of the Coroner's Office participated in the taking of the photographs.  *Id.* at 789-790.  The family members brought claims under Section 1983 and state law claims.  *Id.* at 792.

Plaintiffs rely on one statement in the Sixth Circuit's opinion in *Chesher* to establish Defendants' duty in this case: "The Coroner's Office has a duty to hold bodies placed in its custody in a safe and respectful manner."  *Id.* at 802.  However, the duty to which the Sixth Circuit was referring was in the context of a claim for intentional infliction of emotional distress.  As such, the duty identified was not grounded in the Due Process Clause, but was a function of state law.  The Supreme Court has warned that "the Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society,'" and "rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law."  *Collins v. City of Harker Heights, Tex*., 503 U.S. 115, 128 (1992) (quoting Daniels v. Williams, 474 U.S. at 332); *see also DeShaney v. Winnebago County Dep't of Social Servs*., 489 U.S. 189, 195 (1987) (explaining that the Due Process Clause is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.").  Therefore, this Court rejects Plaintiffs' theory that the Due Process Clause imposes a duty under the facts of this case.

Plaintiffs' second theory has more traction.  The act of having sex with a dead body is certainly shocking conduct.  However, Kersker and Dr. Cleveland did not engage in that

---

instead the Coroner was Dr. Carl Parrott.  *Id.*

conduct, nor is there any evidence which indicates that they were aware that Douglas was engaging in that conduct. Therefore, the question is whether Kersker and Dr. Cleveland's failure to prevent Douglas' conduct shocks the conscience.

The Supreme Court has instructed that the "substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 837 (1998) (quoting Collins, 503 U.S. at 129). In *County of Sacramento v. Lewis*, the Supreme Court attempted to define this concept further by explaining that:

> the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability. Thus, we have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. In *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–1161, 47 L.Ed.2d 405 (1976), for example, we explained that the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States," and in *Daniels v. Williams*, 474 U.S., at 332, 106 S.Ct., at 665, we reaffirmed the point that "[o]ur Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. *See id.*, at 328, 106 S.Ct., at 663; *see also Davidson v. Cannon*, 474 U.S., at 348, 106 S.Ct., at 670–671 (clarifying that Daniels applies to substantive, as well as procedural, due process). It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

12

*Id.* at 848-49.   The Court explained that whether conscience-shocking conduct has occurred is "tested by an appraisal of the totality of facts in a given case.  That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial."  *Id.* at 850 (quoting Betts v. Brady, 316 U.S. 455, 462 (1942)).

In *County of Sacramento v. Lewis* itself, the Court held "that high-speed chases with no intent to harm suspects physically or to worsen their legal plight" did not give rise to due process liability.   523 U.S. at 854.   However, the Court explained in contrast to the emergency situation created by a police chase, "deliberate indifference" would be sufficient to shock the conscience in a prisoner misconduct case, because of "the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection."  *Id.* at 853.

Using these general principles as a guide, the Court finds that there are two cases from this district which are factually similar to this case, but there are key distinctions which make the conclusions in those cases inapplicable here.

The first case is *Chesher v. Neyer*, Case No. 1:01cv566, the appeal of which was mentioned above.   The *Chesher* court first denied the individual Hamilton County defendants' motion for summary judgment based on qualified immunity on the federal claims (1:01cv566, Doc. 224), and later denied the same defendants state law immunity under Ohio Revised Code 2744 (1:01cv566, Doc. 380).   Following the appeal of the *Chesher* court's denial of immunity on the state-law claims, the case ended in a settlement. (1:01cv566, Doc. 475.)

13

In finding that the individual defendants were not entitled to qualified immunity, the *Chesher* court found that it was clearly established that a substantive due process violation occurs where "authorities permit[ ] a corpse to go unguarded resulting in its manipulation for reasons not related to law enforcement, medical, or other governmental purposes." (1:01cv566, Doc. 224, at 12.) In so finding, the *Chesher* court relied heavily on the second case that this Court finds factually similar, yet distinguishable, from the present case: *Barrett v. Outlet Broadcasting, Inc.*, 22 F. Supp. 2d 726 (S.D. Ohio 1997).

In *Barrett*, the Columbus Police Department implemented a policy whereby civilian observers were permitted to ride along with police officers while they performed their duties. *Id.* at 730. Pursuant to the policy, a local reporter requested to accompany a homicide detective. *Id.* at 731. The reporter explained to the detective that he was looking for video footage to tie in with the NBC premiere of the television show *Homicide: Life on the Streets. Id.* The reporter requested "unrestricted access." *Id.* While there was some factual dispute as to what restrictions were actually placed on the reporter, the record shows that the reporter was permitted to enter the home of the plaintiffs' mother, who had shot her common-law husband and then shot herself. *Id.* The news crew filmed the death scene, as well as the detectives re-enacting their investigation. *Id.* at 733. The footage included graphic pictures of the body of plaintiffs' partially-dressed mother, and plaintiffs alleged that their mother's body and room were not in the same condition as when they left the scene. *Id.* The footage was not only shown during news programs, but also during commercial advertisements for the continuing news series on the Columbus Homicide Squad. *Id.*

14

In analyzing the claims, the *Barrett* court noted that the Sixth Circuit has described substantive due process as "the right to be free from state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience" of a court.  *Id.* at 744 (citing Lillard v. Shelby Cnty. Bd. of Educ., 76 F.3d 716, 725 (6th Cir. 1996)).   The *Barrett* court concluded that the "Defendants' alleged disturbance of Ms. Smith's body and bedroom in order to portray her in a false light is sufficiently demeaning to shock the conscience of the court."  *Id.*

The key difference between *Chesher* and *Barrett* and this case is that in *Chesher* and *Barrett*, there was evidence in the record that indicated that the officials knew that the conscience-shocking conduct was occurring.  Here, there is no evidence in the record that Kersker and Dr. Cleveland knew Douglas was having sex with the dead bodies.

Plaintiffs point to the evidence in the record which indicates that Kersker and Dr. Cleveland knew that Douglas had a drinking problem.  Specifically, Plaintiffs rely on Douglas' attendance problems and Chavis' testimony that she called Kersker and explained that Douglas was coming home drunk from work.  Plaintiffs also point to Chavis' testimony that she told Kersker that Douglas came home "smelling like sex."   Finally, Plaintiffs rely on the following testimony from Kersker:

> Q:   One of the things you'd be worried about if you had a morgue attendant that was drunk is that he would -- because he was drunk, he would disrespect or harm the bodies?
>
> A:   That's why he wouldn't be there.

(Kersker Depo. at 120.)

However, even if the Court were to view this evidence and draw all reasonable

15

inferences in favor of Plaintiffs, this evidence does not show that Kersker or Dr. Cleveland knew that Douglas would have sex with dead bodies.  Even if Kersker or Dr. Cleveland knew Douglas was a drunk and a "ladies man," there is nothing in the record which shows that they had any indication that Douglas was participating in such deplorable conduct.

Therefore, the Court concludes that Plaintiffs have not established that Kersker or Dr. Cleveland violated their substantive due process rights.  Because Plaintiffs have failed to establish a constitutional violation, this Court does not need to consider whether Plaintiffs' constitutional right was clearly established for purposes of qualified immunity. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").  Accordingly, the Court concludes that Defendants Kersker and Dr. Cleveland are entitled to qualified immunity on Plaintiffs' substantive due process claim.

### 3.    Procedural due process

"A procedural due process limitation, unlike its substantive counterpart, does not require that the government refrain from making a substantive choice to infringe upon a person's life, liberty, or property interest.  It simply requires that the government provide 'due process' before making such a decision."  *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996).

"In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest."  *Albrecht v. Treon*, 617 F.3d 890, 894

(6th Cir. 2010) (quoting Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir. 2006)). "Although property rights are principally created by state law, whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law." *Id.* (quoting Waeschle v. Dragovic, 576 F.3d 539, 544-45 (6th Cir. 2009)).

There are two Sixth Circuit decisions which touch on the issue of whether family members have a property interest in the dead body of a relative under Ohio law. The first is *Brotherton v. Cleveland*, 923 F.2d 477 (6th Cir. 1991), which arose out of the Hamilton County Coroner's custom and policy of removing corneas from dead bodies arriving in the Morgue before obtaining consent or inspecting medical records or hospital documents.

In *Brotherton*, the plaintiff had declined to donate her husband's organs at the hospital, and her refusal was documented in the hospital's records. 923 F.2d at 478. The hospital made no attempt to inform the Coroner of the objection to making an anatomical gift, and the Coroner did not inquire as to whether there was an objection. *Id.* The Coroner removed the corneas under a Ohio statute which permitted the coroner to remove the corneas of autopsy subjects without consent, provided that the coroner had no knowledge of an objection by the decedent, the decedent's spouse, or the person authorized to dispose of the body. *Id.* (citing Ohio Rev. Code § 2108.60).

The Sixth Circuit examined Ohio law and noted that Ohio had adopted the Uniform Anatomical Gift Act, which expressly granted the plaintiff the right "to control the disposal of [her husband's] body." *Id.* at 482. The Sixth Circuit also reviewed two Ohio court decisions which stopped short of specifically finding a property right in a dead body, but

17

recognized "a possessory right to his body" and allowed "a claim for disturbance of his body." *Id.* (citing  Carney v. Knollwood Cemetery Ass'n, 514 N.E.2d 430, 434-35 (Ohio Ct. App. 1986)); *Everman v. Davis*, 561 N.E.2d 547 (Ohio Ct. App. 1989)).[6]  The Sixth Circuit concluded that "the aggregate of rights granted by the state of Ohio to [the plaintiff] rises to the level of a 'legitimate claim of entitlement' in [her husband]'s body, including his corneas, protected by the due process clause of the fourteenth amendment."  *Id.*[7]

The second decision by the Sixth Circuit is *Albrecht v. Treon*, which addressed the Clermont County Coroner's practice of retaining the brain after performing an autopsy for

---

[6]In *Carney*, cemetery employees dug up and discarded the skeletal remains of the decedent.  514 N.E.2d at 431.  The court was critical of the "fiction" that a "quasi-property right" existed in a decedent's body, but agreed that a cause of action existed for mishandling a corpse.  *Id.* at 435.  The court explained that this cause of action was "a sub-species" of the tort of infliction of serious emotional distress:

> The basis for recovery of damages is found not in a property right in a dead body but in the personal right of the family of the deceased to bury the body. The mutilating or disturbing of the corpse is held to be an interference with this right and an actionable wrong.

> The law is not primarily concerned with the extent of physical injury to the bodily remains but with whether there were any improper actions and whether such actions caused emotional or physical suffering to the living kin.  The tort rarely involves pecuniary injury; the generally recognized basis of damage is mental suffering.

*Id.* (quoting Scarpaci v. Milwaukee Cnty., 292 N.W.2d 816, 820-21 (Wisc. 1980)).

[7]Under similar facts in *Whaley v. County of Tuscola*, the Sixth Circuit analyzed whether under Michigan law "the next of kin have a right to possess the body for burial and prevent its mutilation."  58 F.3d 1111, 1116 (6th Cir. 1995).  The court concluded:

> In short, Michigan law is virtually identical to Ohio's with regard to the rights it grants in a decedent's body.  The next of kin have the right to dispose of the body in limited circumstances, possess the body for burial, and prevent its mutilation.  Applying *Brotherton*, we therefore hold that Michigan provides the next of kin with a constitutionally protected property interest in the dead body of a relative.

*Id.* at 1116.

18

purposes of further examination.  617 F.3d at 893.  The Coroner would return the remains to family members for disposition without the brain, and later destroy the brain after the examination was completed.  *Id.*  The Coroner did not inform the family members of this practice.  *Id.*  In order to determine whether there was a protected property right in the decedent's brain, this Court certified a question to the Ohio Supreme Court.  *Id.* at 895. The Ohio Supreme Court held that "the next of kin of a decedent upon whom an autopsy has been performed do not have a protected right under Ohio law in the decedent's tissues, organs, blood, or other body parts that have been removed and retained by the coroner for forensic examination and testing."  *Id.* (quoting Albrecht v. Treon, 889 N.E.2d 120, 122 (Ohio 2008)).[8]

Nevertheless, on appeal the family members in *Albrecht* argued to the Sixth Circuit that *Brotherton* controlled, and therefore they had a protected property interest in their son's discarded brain.  *Id.*  However, the Sixth Circuit distinguished *Brotherton* by noting that the right in *Brotherton* was based upon Ohio's adoption of the Uniform Anatomical Gift Act, which expressly granted next of kin the right to dispose of a relative's remains.  *Id.* at 894.  The court explained the statute did not apply in the case before it because the disposal of the decedent's brain was related to the right of a coroner to possess, examine and dispose of a corpse, not the right of next of kin to object or consent to organ donation. *Id.* at 894, n.1.  The court stated the key difference was that the removal of the corneas in

_____

[8]The Sixth Circuit explained that the Ohio Supreme Court's use of the term "protected right" was derived from the language in question submitted by this Court.  617 F.3d at 896, n.3. However, the Sixth Circuit determined that the use of "protected" rather than "property" was a misstatement, and it was clear that this Court understood that there is a separate state and federal component to the plaintiffs' claim.  *Id.*

*Brotherton* served no investigative function whatsoever, but the decedent's brain was removed and retained for legitimate forensic study.  *Id.* at 897 (citing Waeschle, 576 F.3d at 546-47).[9]  The court explained "*Brotherton* applies only in the narrow circumstance of unauthorized removal of body parts for donations, and should not be expanded to include claims by next of kin for bodily tissues retained by a government official for legitimate criminal investigations."  *Id.*

Plaintiffs argue that *Albrecht* dealt narrowly with autopsy specimens and therefore its holding does not affect this case.  Plaintiffs argue that instead, the decision in *Chesher v. Neyer* controls, which recognized that "meddling with" corpses "could be sufficient to infringe the family members' intangible property interests in the deceased bodies." (1:01cv566, Doc. 224, at 13.)  The *Chesher* court based the property right in *Chesher* upon *Brotherton*.  However, the Ohio Supreme Court's decision in *Albrecht*, like the Sixth Circuit's decision in *Albrecht*, would appear to limit the application of *Brotherton* to cases involving Ohio's Anatomical Gift Act.  *See* 118 Ohio St.3d at 352 ("*Brotherton*, however, involved R.C. Chapter 2108, the Anatomical Gift Act, as it related to removal of corneas from autopsy subjects for use by eye banks.  Thus, *Brotherton*'s specific holding regarding removal of corneas for purposes unrelated to the autopsy is not relevant in this case.").[10]

_____

[9]*Waeschle* addressed facts which were nearly identical to the facts in *Albrecht*, but *Waeschle* was governed by Michigan law instead of Ohio law.

[10]The Ohio Supreme Court also appears to question the breadth of the holding in *Brotherton* to the extent that it holds that a protected property right exists in a dead body.  The Ohio Supreme Court quotes extensively from the dissent in *Brotherton*:

The dissent in *Brotherton* charged that the majority was "wrong in its holding that the procedural requisites for dealing with non-property can rise to become property and be protected by the fourteenth amendment.  Nor can the grant of procedures to enhance the health and well-being of others in society and the imposition of

20

The *Chesher* court did not have the benefit of the decisions in *Albrecht* when it decided

*Chesher*.

The Court finds it unnecessary to reach a solid conclusion at to whether Ohio law

provides for a property interest under the facts of this case, because even if Plaintiffs are

correct in arguing that such a right exists, Plaintiffs cannot go forward with their claims

against Kersker or Dr. Cleveland.  As the Sixth Circuit has explained:

---

duties on persons (coroners or hospitals) grant property rights protected by the fourteenth amendment in favor of the decedent's relatives." *Id.*, 923 F.2d at 484.

*Albrecht*, 118 Ohio St.3d at 352.  The Ohio Supreme Court also noted that:

> Although this court has not previously addressed this issue, several lower Ohio courts, in cases decided prior to *Brotherton*, held that a dead body is not property. In *Hadsell v. Hadsell* (Allen Cir. Ct. 1893), 7 Ohio C.C. 196, 1893 WL 942, *3, the court held that "[a] dead body is not property."  Similarly, in *Hayhurst v. Hayhurst* (Mar.1926), Hamilton C.P. No. 199594, 4 Ohio Law Abs. 375, 1926 WL 2487, the Hamilton County Common Pleas Court held that "[t]here can be no property in a dead body and therefore a man cannot by will, dispose of same, and it does not become part of his estate."  And as previously mentioned, in *Carney* and *Everman*, two Ohio courts more recently rejected the theory that a surviving custodian has quasi-property rights in the body of the deceased.

*Id.* at 357.  This Court notes further that in *Carney*, the court discussed at length what it called the "quasi-property fiction."  514 N.E.2d at 434.  The *Carney* court explained that the fiction was created to facilitate recovery for the mishandling of a dead body without conceding the existence of a cause of action for emotional distress:

> "Quasi property" seems to be, however, simply another convenient "hook" upon which liability is hung,--merely a phrase covering up and concealing the real basis for damages, which is mental anguish.  The plaintiff, in these actions, does not seek to vindicate any "quasi property" right.  He sues simply because of the mental suffering and anguish that he has undergone from the realization that disrespect and indignities have been heaped upon the body of one who was close to him in life.

*Id.* at 434-35 (quoting  Note, Damages: Pleading: Property: Who May Recover for Wrongful Disturbance of a Dead Body (1933), 19 Cornell L.Q. 108, 110–1115).  Accordingly, while Plaintiffs may not be able to maintain a constitutional claim, Plaintiff may still have emotional distress claims, which Ohio now recognizes.

> liability under § 1983 cannot be based on the doctrine of *respondeat superior*.  *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citing *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)).  For supervisory liability to attach, the officers must have done "more than play a passive role in the alleged violation or showed mere tacit approval of the goings on."  *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).  "At a minimum a plaintiff must show that the [supervising] official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."   *Shehee*, 199 F.3d at 300.

*Spangler v. Wenninger*, 388 F. App'x 507, 512 (6th Cir. 2010).  Here, Plaintiffs have failed to meet that minimum showing.  As discussed above, there is no evidence in the record which shows that Kersker or Dr. Cleveland knew that Douglas was having sex with the dead bodies.  Therefore, the facts of this case prevent Plaintiffs from maintaining a claim of procedural due process against Kersker and Dr. Cleveland.  Accordingly, Kersker and Dr. Cleveland are entitled to qualified immunity on this claim.

### 2.    County liability

A county cannot be held liable under Section 1983 for an injury inflicted solely by its employees or agents.  *Gregory v. Shelby Cnty., Tenn*., 220 F.3d 433, 441 (6th Cir. 2000) (citing Monell v. Department of Social Services of City of New York, 436 U.S. 658, 694 (1978)).  For liability to attach, the plaintiff must establish that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights.  *Powers v. Hamilton Cnty. Public Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting Monell, 436 U.S. at 694).  Plaintiffs identify the offending policy or custom in this case as being the failure to supervise Douglas.  Plaintiffs rely on cases which have held that a failure to supervise or provide proper training can give rise to Section 1983 liability.  *See, e.g., Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir.1989), *cert.*

*denied*, 495 U.S. 932 (1990). Plaintiffs argue that the County's failure to address Douglas' problems with alcohol and drugs amounted to deliberate indifference.[11]

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 397 (1997). A showing of simple or even heightened negligence will not suffice. *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir. 1997). "Deliberate indifference . . . does not mean a collection of sloppy, or even reckless oversights, it means evidence showing an obvious, deliberate indifference . . ." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996).[12]

A plaintiff can show deliberate indifference in one of two ways. First, a plaintiff can present evidence of "prior instances of unconstitutional conduct demonstrating that the

---

[11]To the extent that Plaintiffs argue that Dr. Cleveland or Kersker is liable in his individual capacity for the failure to supervise Douglas, the Sixth Circuit has explained that such a claim "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 563 (6th Cir. 2011) (quoting Phillips v. Roane Cnty., Tenn., 534 F.3d 531, 543 (6th Cir. 2008). The court also noted that "absent evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are properly deemed brought against them in their official capacities, to be treated as claims against the county." *Id.* (citing Miller v. Calhoun Cnty., 408 F.3d 803, 817 n.3 (6th Cir. 2005)).

[12]Defendants argue that the "'plainly obvious' notice standard" should apply in this case. The "plainly obvious" language was discussed by the Supreme Court in *Board of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). The Court traced the language back to its decision in *Canton v. Harris*, where it explained that "[i]t could . . . be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Id.* (quoting Canton, 489 U.S. 378, at 390, n.10 (1989)). However, the Court distinguished this type of failure-to-train claim in *Canton* from the claim in *Brown*, which was that the county was liable for the sheriff's single decision to hire a deputy without an adequate background check. 520 U.S. at 410. Upon reading *Brown*, this Court finds that the "plainly obvious" language from *Canton* is applicable. However, because Plaintiffs have not challenged the decision to hire Douglas, the Court does not find applicable the cases cited by Defendants which involved a single hiring decision.

County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005)). In the alternative, a plaintiff can show "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Id.* (citing Brown, 520 U.S. at 409).

Plaintiffs have not met their burden of showing deliberate indifference in this case. While there are genuine issues of material fact as to whether Kersker or Dr. Cleveland ignored Douglas' use of alcohol and drugs while he was working at the Morgue, there is no evidence that Kersker or Dr. Cleveland disregarded that a known or obvious consequence of Douglas' intoxication would be that Douglas would have sex with the dead bodies. There is no evidence of a pattern or history of Douglas or any other person having sex with the dead bodies that would have caused alert. Similarly, there is no evidence that there were recurring situations which presented an obvious potential for such conduct. As the Supreme Court has explained: "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 131 S. Ct. 1350, 1360, (2011). Accordingly, the Court finds that the County is entitled to summary judgment on Plaintiffs' Section 1983 claim.

### E.    State law claims

Plaintiffs bring state law claims of intentional infliction of emotional distress and negligent infliction of emotional distress against Kersker and Dr. Cleveland. Plaintiffs' state

law claims against the County are negligent infliction of emotional distress and negligent retention and supervision.[13]   Defendants first argue that this Court should not retain jurisdiction over Plaintiffs' state law claims after Plaintiffs' Section 1983 claims are dismissed.  Next, Defendants argue that if the state law claims proceed in this Court, they are entitled to immunity from these claims under Ohio Revised Code § 2744.   Third, Defendants argue that Plaintiffs' emotional distress claims should be dismissed.  Finally, Defendants argue that Plaintiffs are not entitled to punitive damages against the County or Kersker.

### 1.    Supplemental jurisdiction

A district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims."  *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996).  However, "there is no mandatory rule" stating that a district court must dismiss a pendent state law claim if it dismisses all the federal claims in a case.  *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (explaining that "a district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary").

---

[13]The Ohio Supreme Court has held that there are no exceptions to immunity under Ohio Revised Code § 2744 for the intentional tort of intentional infliction of emotional distress. *Hubbard v. Canton City Sch. Bd. of Educ.*, 780 N.E.2d 543, 546 (Ohio 2002) (quoting Wilson v. Stark Cty. Dept. of Human Servs., 639 N.E.2d 105, 107 (Ohio 1994)).  Accordingly, Plaintiffs do not bring their claim of intentional infliction of emotional distress against the County.

When deciding whether to resolve a pendant state law claim, a court must "balance the interests." *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 211 (6th Cir. 2004) (citing Long v. Bando Mfg. of Am., Inc., 201 F.3d 754, 758 (6th Cir. 2000)). These interests include "judicial economy and the avoidance of multiplicity of litigation," which should be balanced against "needlessly deciding state law issues." *Id.* "The court also may consider whether the plaintiff has used 'manipulative tactics' to defeat removal and secure a state forum, such as 'simply by deleting all federal-law claims from the complaint and requesting that the district court remand the case.'" *Id.* (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 357 (1988).

The Court finds that Plaintiffs have not used manipulative tactics. This matter has been pending before this Court since it was filed here in 2010. The Court has held several conferences with the parties, including initial settlement discussions with the attorneys and a final pretrial conference. The Court concludes that in the interest of judicial economy, the pendent state-law claims will remain here.

### 2. Immunity under Ohio Revised Code Chapter 2744

Both the County and the individual Defendants claim immunity pursuant to Ohio's Political Subdivision Tort Liability Act, codified in Ohio Revised Code Chapter 2744. It is important to note that Plaintiffs' claims against the individual Defendants are in their official and individual capacity. Under Ohio law, official capacity claims are "simply another way of pleading an action against the governmental entity itself." *Chesher*, 477 F.3d at 797 (citing Norwell v. City of Cincinnati, 729 N.E.2d 1223, 1232 (Ohio Ct. App. 1999)). Therefore, the Court will discuss these official capacity claims and the claims against the

26

County as one in the same.

Ohio's Political Subdivision Tort Liability Act was enacted in 1985, and addresses when political subdivisions, their departments and agencies, and their employees are immune from liability for their actions. *Lambert v. Clancy*, 927 N.E.2d 585, 588 (Ohio 2010). The Act was passed in response to the Ohio Supreme Court's abolishment of the common-law doctrine of sovereign immunity for municipal corporations in *Haverlack v. Portgage Homes, Inc.*, 442 N.E.2d 749 (Ohio 1982) and counties in *Zents v. Bd. of Comm'rs.*, 459 N.E.2d 881, 885 (Ohio 1984) ("Simply put, counties are, by this decision, subject to the same rules as private persons or corporations if a duty has been violated and a tort has been committed."). The General Assembly has amended Chapter 2744 several times since its initial enactment in 1985. This Court must apply the version of the Act which was in effect at the time the alleged acts occurred. *Hubbard v. Canton City Sch. Bd. of Educ.*, 780 N.E.2d 543, 547 (Ohio 2002).

Douglas had sex with the dead body of Karen Sue Range in August of 1982, which was before the enactment of Chapter 2744 and also before the Ohio Supreme Court abolished common law immunity for counties in 1984. However, the Ohio Supreme Court has held that abolition of governmental immunity shall be applied retroactively. *Zagorski v. South Euclid-Lyndhurst Bd. of Educ.*, 471 N.E.2d 1378 (Ohio 1984); *Ruwe v. Bd. of Cnty. Comm'rs of Hamilton Cnty.*, 488 N.E.2d 157, 159 (Ohio 1986) (applying *Zents* to cause of action which arose in 1980).

Defendants argue that the Ohio Supreme Court did not abolish common law immunity to the extent that a county or its employees were engaged in executive or

27

planning functions.  Defendants are correct that the Ohio Supreme Court explained that immunity did exist under certain conditions:

> no tort action will lie against a county for those acts or omissions involving the exercise of an executive or planning function or involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.  However, once the decision has been made to engage in a certain activity or function, a county will be held liable, the same as private corporations and persons, for the negligence of its employees and agents in the performance of their activities.

*Zents*, 459 N.E.2d at 884-85; *see also Enghauser Mfg. Co. v. Eriksson Eng'g Ltd.*, 451 N.E.2d 228, 232 (Ohio 1983) (explaining that a distinction is to be made between "those functions which rest on the exercise of judgment and discretion and represent planning and policy-making and those functions which involve the implementation and execution of such governmental policy or planning.").  None of the acts about which Plaintiffs complain can be characterized as exercising an executive or planning function or involving the making of a basic policy decision.  Plaintiffs' claims are based on the supervision of Douglas, not the plan to employ Morgue Attendants in the Coroner's Office, or the policies which governed Morgue Attendants.  As the Ohio Supreme Court explained, once the decision to engage in a certain activity or function has been made, a county will be liable for the negligence and agents in the performance of their activities.  Therefore, the Court concludes that the County is not entitled to immunity under Ohio common law vis-a-vis the state-law claims brought by the family members of Karen Sue Range.

As to the claims brought by the family members of Karen Sue Range against Kersker and Dr. Cleveland in their individual capacity, before the enactment of Chapter 2744, Ohio law provided that absent bad faith or corrupt motive, public officials acting within the scope of their authority were not individually liable for their failure to properly

28

perform a duty involving judgment or discretion. *Scot Lad Foods v. Sec'y. of State*, 418 N.E.2d 1368, 1373 (Ohio 1981). Supervising an employee is an act involving judgment or discretion. *Accord Catalina v. Crawford*, 483 N.E.2d 486, 489 (Ohio Ct. App. 1984) (explaining that "defendants clearly exercised judgment and discretion in determining that plaintiff's work performance and ability to relate to her co-workers were no longer acceptable and in determining what the appropriate response to these problems should be."). Therefore, Kersker and Dr. Cleveland are immune in their individual capacities unless there is evidence of bad faith or corrupt motive.

Ohio courts have defined "bad faith" in this context as follows:

[B]ad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.

*Id.* (citing Slater v. Motorists Mutual Ins. Co., 187 N.E.2d 45 (Ohio 1962)). The Court finds that there is no evidence in the record that Kersker or Dr. Cleveland had a dishonest purpose, ulterior motive or ill will. Therefore, Kersker and Dr. Cleveland are entitled to immunity from the state law claims brought against them in their individual capacity by the family members of Karen Sue Range.

The Court will now turn to the state-law claims brought by the family members of Charlene Appling and Angel Hicks. Douglas had sex with the body of Charlene Appling in October of 1991 and the body of Angel Hicks in November of 1991. The Court will apply the version of Chapter 2744 in place at that time.

Under Chapter 2744, Ohio courts employ a three-tier analysis to determine whether a political subdivision is entitled to immunity from civil liability. *Cater v. Cleveland*, 697

29

N.E.2d 610, 614 (Ohio 1998).  First, section 2744.02(A)(1) sets out a general rule that political subdivisions are not liable in damages.  *Greene Cnty. Agric. Soc. v. Liming*, 733 N.E.2d 1141, 1146 (Ohio 2000).[14]  In setting out this rule, section 2744.02(A)(1) classifies the functions of political subdivisions into governmental and proprietary functions, and states that the general rule of immunity is not absolute, but is limited by the exceptions found in section 2744.02(B).  *Id.*[15]  Under the second tier of the analysis, it must be determined whether any of the exceptions in section 2744.02(B) apply.  *Id.*  If any of the exceptions are found to apply, the third tier of analysis is a consideration of the defenses found in section 2744.03.  *Id.*

Under the first tier of the analysis, Plaintiffs do not challenge that the County qualifies for the general grant of immunity found in section 2744.02(A)(1).  Instead, Plaintiffs rely on an exception to the general rule of immunity.  The former version provided

_____

[14]Both the current and past versions of Ohio Revised Code § 2744.02(A)(1) provide that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."

[15]Chapter 2744 defines a governmental function as one that satisfies any of the following criteria:

(a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;

(b) A function that is for the common good of all citizens of the state;

(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.

Ohio Rev. Code §2744.01(C)(1).  A proprietary function is generally defined as one that "promotes or preserves the public peace, health, safety or welfare and that involves activities customarily engaged in by nongovernmental persons." Ohio Rev. Code §2744.01 (G)(1)(b).

as follows:

> Except as otherwise provided in section 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code.

Ohio Rev. Code §2744.02(B)(4).[16]  In interpreting this former version, the Ohio Supreme Court found that the exception applied to all cases where injury resulted from the negligence of an employee, not just those injuries which resulted from physical defects or negligent use of grounds or buildings.  *Hubbard*, 780 N.E.2d at 454-55.  Therefore, this Court finds that this exception is applicable because any negligent acts, if proved, did occur on the grounds of the Hamilton County Morgue.

Defendants argue that under the third tier of the analysis, the County is entitled to rely on the defenses found in Ohio Revised Code § 2744.03(A)(3) and (5):

> (3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.
>
>  . . .
>
> (5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or

---

[16]An amended version of Section 2744.02(B)(4) became effective on April 9, 2003, and is still the current version today. This section now only excludes negligence that "is due to physical defects within or on the grounds of" a building being used by a political subdivision for a governmental function.

31

discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.[17]

The Ohio Supreme Court has explained the relationship between these two defenses:

> Pursuant to the R.C. 2744.03(A)(3) defense, a court must determine whether there are any policy-making, planning, or enforcement powers involved, and then look to see whether the political subdivision's employee had discretion with respect to those powers by virtue of that employee's office or position. Although both R.C. 2744.03(A)(5) and 2744.03(A)(3) concern an employee's discretionary acts, the focus of subsection (A)(3) is that the employee be engaged in policy-making, planning, or enforcement. . . . In other words, a political subdivision may assert the immunity defense when an employee who has the duty and responsibility for policy-making, planning, or enforcement by virtue of office or position actually exercises discretion with respect to that power.

*Elston v. Howland Local Sch.*, 865 N.E.2d 845, 851 (Ohio 2007).

The Ohio Supreme Court has also explained that "[t]he nonliability provisions of [R.C. 2744.03] must be read more narrowly than the liability provisions of R.C. 2744.02(B), or the structure of R.C. Chapter 2744 makes no sense at all." *Greene Cnty. Agric. Soc.*, 733 N.E.2d at 1149; *see also Willis v. Commodity Specialists Co.*, 816 N.E.2d 611, 617 (Ohio Ct. App. 2004) ("In other words, the defenses and immunities of R.C. 2744.03 cannot be read to swallow up the liability provisions of R.C. 2744.02(B) so as to render them nugatory.") (quoting Howell v. Union Twp. Trustees, No. 96CA2430, 1997 WL 142388 (Ohio Ct. App. 2004)).

Here, Plaintiffs argue that the acts by Kersker and Dr. Cleveland which gave rise to their claims were making decisions as to whether Douglas required more or different supervision. Plaintiffs argue that these types of decisions do not rise to the level of

---

[17]No changes have been made to these subsections, and therefore version in place in 1991 is identical to the current version. Accordingly, the Court finds it appropriate to rely on decisions interpreting and applying this subsection after 1991.

"policy-making, planning, or enforcement powers."

There is no dispute that Dr. Cleveland, by virtue of the duties and responsibilities of the office of coroner, had the discretion to make decisions regarding the hiring, firing, and supervision of employees in the Coroner's Office.  By statute, the county coroner is given the authority to appoint personnel and define their duties.  Ohio Rev. Code § 313.05 ("The coroner may appoint clerks, stenographers, custodians, and investigators and shall define their duties.").  There is evidence in the record that Kersker had the discretion to set work schedules and discipline the employees.  (Kersker Depo. at 106-109.)  Therefore, this Court must determine whether Kersker or Dr. Cleveland's supervision of Douglas involved any policy-making, planning or enforcement powers.

One Ohio court has described the type of discretion that is immunized by Chapter 2744 as follows: "Immunity attaches only to the broad type of discretion involving public policy made with 'the creative exercise of political judgment.' . . .  Immunity does not apply to the negligence of employees in 'the details of carrying out the activity even though there is discretion in making choices.'"  *McVey v. Cincinnati*, 671 N.E.2d 1288, 1290 (Ohio Ct. App. 1995) (quoting Bolding v. Dublin Local Sch. Dist., 1995 WL 360227, *3 (Ohio Ct. App. June 15, 1995)).  In *McVey*, the plaintiff was injured when she was knocked backward on an over-crowded escalator at Riverfront Stadium in Cincinnati.  *Id.* at 1289.  The plaintiff claimed that the city was negligent in failing to control the crowd entering and exiting the escalator.  *Id.*  The court denied immunity to the city based on the stadium manager's decision to forgo placing employees near the escalators:

> Without question, the city made a decision, at some unspecified time, to install escalators in its stadium parking facility.  That decision itself may have involved discretion.  The operation of the escalators is a different issue,

33

however, and the discretion involved in "making choices" hardly rises to the "creative exercise of political judgment."

*Id.* (quoting Bolding, 1995 WL 360227, at *3).

This Court concludes that the coroner's supervision of employees does not involve the "creative exercise of political judgment." While Dr. Cleveland undoubtedly had the discretion to set rules about the conduct of morgue attendants, the supervision of Douglas only involved the details of enforcing those rules. *Accord Thompson v. Smith*, 899 N.E.2d 1040, 1053 (Ohio Ct. App. 2008) (police duty of responding to emergency does not involve exercise "policy-making, planning, or enforcement powers" contemplated by section 2744.03(A)(3)). Therefore, section 2744.03(A)(3) does not apply to the actions of Kersker or Dr. Cleveland; and the County is not entitled to immunity based on this defense.

However, under section 2744.03(A)(5), Plaintiffs do not dispute that the supervision of Douglas involved the "exercise of judgment or discretion in determining whether to acquire, or how to use . . . personnel."[18] Instead, Plaintiffs argue that Kersker and Dr. Cleveland acted wantonly and recklessly in failing to supervise Douglas and in retaining him.

Generally, Ohio courts have held that the issue of whether a government employee acts with malice, bad faith, or in a wanton or reckless manner is a question for the jury. *Fabrey v. McDonald Village Police Dept.*, 639 N.E.2d 31, 35 (Ohio 1994); *Barrett*, 22 F.Supp.2d at 750-51. However, where the evidence in the record does not suggest a

---

[18]By analogy, this Court notes that the Ohio Supreme Court has recognized that a classroom teacher has "wide discretion under R.C. 2744.03(A)(5) to determine what level of supervision is necessary to ensure the safety of the children in" his or her care. *Elston,* 865 N.E.2d at 850 (quoting Marcum v. Talawanda City Schools, 670 N.E.2d 1067, 1070 (Ohio Ct. App. 1996)).

material factual issue on the question of whether the defendant's judgment or discretion was exercised with malicious purpose, bad faith, or in a wanton or reckless manner, summary judgment is appropriate.  *Wamsley v. W. Jefferson*, 743 N.E.2d 442, 446 (Ohio Ct. App. 2000) (citing Marcum v. Talawanda City Sch., 670 N.E.2d 1067, 1070-71 (Ohio Ct. App. 1996)).  Above, this Court has already determined that the evidence in the record does not support any claim that Kersker or Dr. Cleveland acted in bad faith.

The Ohio Supreme Court has held that as the term is used in Chapter 2744, "'[m]alicious' means 'indulging or exercising malice; harboring ill will or enmity.'"  *Jackson v. Butler Cnty. Bd. of Cnty. Comm'rs.*, 602 N.E.2d 363, 367 (Ohio Ct. App. 1991) (quoting Teramano v. Teramano, 216 N.E.2d 375, 377 (Ohio 1966)).  "Malice" has also been defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified.  *Id.* (citing Bush v. Kelley's, Inc., 247 N.E.2d 745, 747-48 (Ohio 1969)).

Under Ohio law, wanton conduct has been defined as "the failure to exercise any care whatsoever."  *Fabrey*, 639 N.E.2d at 35 (citing Hawkins v. Ivy, 363 N.E.2d 367, 369 (Ohio Ct. App. 1977)).  However, "mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor."  *Id.* (quoting Roszman v. Sammett, 269 N.E.2d 420, 422 (Ohio 1971)).  "Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury."  *Id.*; *see also Addis v. Howell*, 738 N.E.2d 37, 40-41 (Ohio Ct. App. 2000) (explaining that wanton misconduct "implies the failure to exercise any care for the safety of those to whom a duty of care is owing when the wrongdoer has

knowledge of the great probability of harm to such persons which the exercise of care might avert, and exhibits a reckless disregard of consequences; it does not embrace intent to injury.").

Finally, under Ohio law, an individual acts in a "reckless" manner "if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill*, 559 N.E.2d 705, 708 (Ohio 1990) (quoting Restatement (Second) of Torts at 587 (1965)).

Dr. Cleveland and Kersker's actions "do not rise to the level of maliciousness or bad faith, because each requires purposeful wrongdoing." *Moss v. Lorain Cnty. Bd. of Mental Retardation*, 924 N.E.2d 401, 407 (Ohio Ct. App. 2009). However, the Court finds that there are genuine issues of material fact as to whether Dr. Cleveland or Kersker's supervision of Douglas was in a wanton or reckless manner. *Accord Moss*, 924 N.E.2d at 407 (finding "employees acted in a wanton or reckless manner given the allegations that the supervision of these young, special-needs children was so lax that Jacob was able to leave the group and enter the kitchen area completely undetected to reach for a pot of hot coffee.").

There is no dispute that Kersker and Dr. Cleveland had a duty to protect the bodies housed in the Morgue. As the Sixth Circuit has recognized, under Ohio law, "[t]he Coroner's Office has a duty to hold bodies placed in its custody in a safe and respectful manner." *Chesher*, 477 F.3d at 802. Kersker testified that it was his duty to supervise the

36

Morgue Attendants to insure that they were protecting the bodies from harm and treating them with dignity.  (Kersker Depo. at 54.)  However, there is a genuine issue of material fact as to whether the supervision of Douglas was so lax that he was able to have sex with the dead bodies of Karen Sue Range, Charlene Appling and Angel Hicks.

Specifically, there is evidence in the record that Dr. Cleveland and Kersker ignored Douglas' use of alcohol and drugs while he was on the job.  Kersker testified that he would not allow a drunk morgue attendant to work in the Morgue because he would disrespect or harm the bodies.  (Kersker Depo. at 120.)  Yet, when Douglas' wife, Chavis, informed Kersker that Douglas was coming home from work drunk, Kersker took no action and told her not to call again.

Kersker testified that he "wasn't there at nighttime.  I don't know what they did at night."  (Id.)  However, the County maintains that based on its records, Douglas had sex with the body of Karen Sue Range during the early morning hours of Friday, August 20, 1982.  (Doc. 82, at 21-22 (citing Doc. 82-1, Andrea Hatten Aff., Ex. A-14).)  The County maintains that Douglas had sex with the body of Angel Hicks at some time during the morning of Sunday, December 8, 1991.  (Id. (citing Hatten Aff., Ex. C-3).)

Moreover, Douglas testified that in addition to having sex with the dead bodies of Karen Sue Range, Charlene Appling and Angel Hicks, he used the dead bodies of other women to masturbate:

> A:      . . . But a lot of times, I wouldn't climb up on top of the body, I would just put my hands on them and masturbate.  A lot of times – that was quite a few times.  I can't put a number on it.
>
>  . . .
>
> Q:      And when you engaged in acts like that . . . were you also under the

37

influence of alcohol and drugs?

A:     Yes.

(Douglas Depo. at 102-103.)[19]  Douglas also explained that he did not engage in this type

of conduct when he worked at a funeral home:

>  . . . I could never do that there.  They had too many people there.  I didn't
>  feel safe.  I felt safe at the morgue.  When I was under the influence, I felt –
>  I didn't care.

(Doc. 85-13, at 52.)

Based on this evidence, this Court concludes that there are genuine issues of

material fact as to whether the County is entitled to rely on the defense found in Ohio

Revised Code § 2744.03(A)(5).  Therefore, the County is not entitled to summary judgment

on the state law claims brought by the family members of Charlene Appling and Angel

Hicks.

The Appling and Hicks Plaintiffs have also brought individual capacity claims against

Kersker and Dr. Cleveland.  Individual capacity immunity is properly analyzed under Ohio

Revised Code § 2744.03(A)(6).  *Beckett v. Ford*, 613 F. Supp. 2d 970, 984 (N.D. Ohio

2009) *aff'd*, 384 F. App'x 435 (6th Cir. 2010).   In 1991, Ohio Revised Code §

2744.03(A)(6)(b) provided that individually named public employees are immune from

liability unless the employee's "acts or omissions were with malicious purpose, in bad faith,

or in a wanton or reckless manner."[20]  For the reasons stated above, the Court finds that

---

[19]In a December 12, 2008 interview with investigators, Douglas stated that it was possible that the number of bodies he used to masturbate was more than ten but he did not think that it was as many as forty-four.  (Doc. 85-13, at 33, 40.)

[20]Subsection "b" has not materially changed.  The version of Ohio Revised Code § 2744.03(A)(6) in place in 1991 provided an employee is immune from liability unless one of the

there are genuine issues of material fact as to whether Kersker or Dr. Cleveland's supervision of Douglas was in a wanton or reckless manner. Therefore, Kersker and Dr. Cleveland are not entitled to summary judgment based on individual capacity immunity under Ohio Revised Code § 2744.03(A)(6)(b).

### 3.   Statute of limitations

Defendants argue that the intentional torts brought against them by the family members of Karen Sue Range are barred by the one-year statute of limitations contained in Ohio Revised Code §§ 2305.10 and 2305.11. Defendants argue that these Plaintiffs knew or should have known about their injury on September 8, 2008, which is the date that Douglas was convicted of Gross Abuse of a Corpse based on having sex with the body of Karen Sue Range. Defendants point out that Plaintiffs did not file their Complaint until July 20, 2010.

Plaintiffs' sole intentional tort claim is the intentional infliction of emotional distress. For the most part, Ohio courts have applied the four-year statute of limitations contained in Ohio Revised Code § 2305.09(D) to claims of intentional infliction of emotional distress. *Yeager v. Local Union 20*, 453 N.E.2d 666, 672 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (2007); *Monak v. Ford Motor Co.*, 95 Fed.Appx.

---

following applies:

> (a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;
>
> (b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> (c) Liability is expressly imposed upon the employee by a section of the Revised Code.

758, 761 (6th Cir. 2004).  However, one Ohio court has held that where a claim for intentional infliction of emotional distress is brought against a political subdivision or its employees, the two-year statute of limitations found in Ohio Revised Code § 2744.04(A) applies.  *Gnezda v. City Of N. Royalton*, 2004 WL 637781 *3 (Ohio Ct. App. Apr. 1, 2004) (explaining that two-year statute of limitations under section 2744.04(A) applies because special provision governing the statute of limitations in tort cases against political subdivisions prevails over the general statutes of limitations contained in Ohio Revised Code Chapter 2305) (citing Koncsol v. Niles, 664 N.E.2d 616, 618 (Ohio Ct. App. 1995)).[21]

Regardless of whether the two-year statute of limitation under Ohio Revised Code § 2744.04(A) or the four-year statute of limitation under Ohio Revised Code § 2305.09(D) is applied, the Range Plaintiffs' claim for intentional infliction of emotional distress is timely. Therefore, Defendants' Motion is denied to the extent that it argues that the Range Plaintiffs' claim for intentional infliction of emotional distress is time-barred.

### 4.  Emotional distress claims

Defendants challenge the merits of the claims of intentional infliction of emotional distress brought by all Plaintiffs, as well as their claims for negligent infliction of emotional distress.

Defendants first argue that Kersker and Dr. Cleveland cannot be liable for the intentional acts or crimes of Douglas.  Defendants argue that Plaintiffs have failed to

---

[21]Section 2744.04(A) provides: "An action against a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, whether brought as an original action, cross-claim, counterclaim, third-party claim, or claim for subrogation, shall be brought within two years after the cause of action accrues, or within any applicable shorter period of time for bringing the action provided by the Revised Code."

present evidence that Dr. Cleveland or Kersker did anything intentionally to cause the emotional distress claimed by Plaintiffs.

In Ohio, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager*, 453 N.E.2d at 671. Under this formulation of the claim, the first element a plaintiff must prove is that "the defendant intended to cause emotional distress, or knew *or should have known* his actions would result in serious emotional distress." *Pyle v. Pyle*, 463 N.E.2d 98, 103 (Ohio Ct. App. 1983) (emphasis added). Therefore, Plaintiffs need not prove that Dr. Cleveland and Kersker intentionally caused their emotional distress or even knew that their actions would result in emotional distress. At this stage, Plaintiffs only need to show that there are genuine issues of material fact as to whether Dr. Cleveland and Kersker should have known that their failure to supervise Douglas would result in serious emotional distress. While Defendants did not argue this point, the Court finds that Plaintiffs have carried their burden.

Next, Defendants argue that only some of the Plaintiffs have received therapy for their alleged emotional distress, and therefore Plaintiffs have not shown serious emotional distress. In the previous case involving the Hamilton County Coroner, the *Chesher* court met a similar argument with the following:

> Ultimately, the Court concludes that determining whether Plaintiffs' injuries were "serious" is a question best determined on a case-by-case basis. Furthermore, it concludes that although the Plaintiffs' level of emotional distress must be "serious," "seriousness" in the context of a mishandled corpse is something unique. It is something that renders a reasonably constituted person "unable to cope adequately" given the distress, but it need not be "severe and debilitating" in the traditional sense.

41

*Chesher*, 392 F. Supp. 2d at 955-56 (noting that in the mishandling of a corpse arena, it might be sufficient to show that plaintiffs were "horrified," "angry," "saddened," "wept," and "were unable to sleep").  This Court then, and now, concludes that whether Plaintiffs' emotional distress was "serious" is a question for the jury.  Therefore, Defendants are not entitled to summary judgment on this basis.

Finally, Defendants argue that merely being informed that Douglas had sex with the dead bodies many years after it occurred is not enough to support a claim for emotional distress.  The Ohio Supreme Court has explained that "Ohio does not recognize a claim for negligent infliction of serious emotional distress where the distress is caused by the plaintiff's fear of a nonexistent physical peril."  *Heiner v. Moretuzzo*, 652 N.E.2d 664, 670 (Ohio 1995).  However, it appears that Ohio recognizes an exception to the "actual-peril requirement" in cases involving the mishandling of a corpse.  *Chesher*, 392 F.Supp.2d at 953 (citing Carney, 514 N.E.2d at 432-33).  Therefore, Defendants are not entitled to summary judgment on this basis.

### 5. Punitive damages

Defendants argue that the County or individuals acting in their official capacity are not liable for punitive damages.  Defendants also argue that Plaintiffs have presented insufficient evidence showing that they are entitled to punitive damages against Kersker.[22]

Ohio Revised Code § 2744.05(A) expressly provides that punitive or exemplary damages under Ohio law shall not be awarded "in an action against a political subdivision to recover damages for injury, death, or loss to person or property caused by an act or

---

[22]Plaintiffs dismissed with prejudice all claims for punitive damages against Dr. Cleveland in his individual capacity.  (Doc. 24.)

omission in connection with a governmental or proprietary function." Therefore, if Plaintiffs prevail on their claims against the County, or the claims against Kersker or Dr. Cleveland in their official capacity, they are not entitled to punitive damages.

However, the immunity from punitive damages available to political subdivisions is not available to government employees sued in their individual capacity where the employee's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). As explained above, the Court finds that there are genuine issues of material fact as to whether Kersker's acts or omissions were wanton or reckless. Therefore, Kersker is not entitled to summary judgment on Plaintiffs' claim for punitive damages.

## III.  <u>CONCLUSION</u>

Based on the foregoing, it is hereby **ORDERED** that:

1.  Defendants' Motion to Dismiss and Motion for Summary Judgment (Doc. 82.) is **GRANTED IN PART and DENIED IN PART**:

    a.  Plaintiffs' claims under 42 U.S.C. § 1983 are dismissed in their entirety;

    b.  The Range Plaintiffs' state law claims of negligent infliction of emotional distress and negligent retention and supervision against the County remain pending;

    c.  The Range Plaintiffs' state law claims of intentional infliction of emotional distress and negligent infliction of emotional distress against Kersker and Dr. Cleveland in their individual capacity are dismissed;

    d.  The Appling and Hicks Plaintiffs' state law claims of negligent infliction of emotional distress and negligent retention and supervision against the County remain pending;

    e.  The Appling and Hicks Plaintiffs' state law claims of intentional

infliction of emotional distress and negligent infliction of emotional distress against Kersker and Dr. Cleveland in their individual capacity remain pending; and

    f.    Plaintiffs are not entitled to recover punitive damages from the County or Kersker or Dr. Cleveland in their official capacity.

2.    Plaintiffs' Motion to Add Lakshmi Sammarco, M.D. as a Party (Doc. 94) is **DENIED**.

**IT IS SO ORDERED.**

                              */s/ Michael R. Barrett*
                              Michael R. Barrett
                              United States District Judge